No. 95,256

STATE OF KANSAS, *Appellee*, v. Jason Cole Hughes, *Appellant.*

(191 P.3d 268)

Opinion filed August 22, 2008.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for the appellant.

*Amy L. Aranda*, assistant county attorney, argued the cause, and *Mark Goodman*, county attorney, and *Paul J. Morrison*, attorney general, were on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: Jason Cole Hughes appeals his convictions for felony murder and aggravated burglary. Hughes contends the district court erroneously admitted evidence in violation of his constitutional rights and the rules of evidence. This court concludes that prejudicial error occurred in the course of the trial, and the case is remanded for retrial.

Hughes and Marcy Carapezza were charged as codefendants with the homicide of Mary Clark. They were tried separately, and both were convicted and have appealed their convictions. Because the facts are the same for both cases, we are not repeating all the facts in this opinion. For a detailed statement of the facts, see the

companion case of *State v. Carapezza*, No. 95,233, this day decided.

Clark was murdered in May 2004. In July 2004, Hughes testified before an inquisition into Clark's death under a grant of immunity. He was later arrested and charged with first-degree premeditated murder or, in the alternative, felony murder; aggravated burglary; aggravated robbery; and misdemeanor theft. The State presented a theory that Hughes and his codefendants robbed and killed Clark to fuel their crack cocaine addictions. With no physical evidence connecting Hughes with the crime scene, the State relied on testimony from Mollie Paico, one of Hughes' codefendants. Paico testified that she had seen Hughes standing over Clark with a hammer. The State also presented testimony from two of Carapezza's cellmates, revealing that Carapezza admitted to participating in Clark's robbery and murder. The State presented additional testimony from several of Hughes' associates in the crack community, who testified about Hughes', Carapezza's, and Paico's use of crack cocaine. In order to establish drug use as the motive for Clark's murder, the State presented testimony from Dr. Eljorn Don Nelson, an expert on drug addiction, regarding the use of crack cocaine, the effects of using crack cocaine, and the behaviors associated with addiction to crack cocaine.

Although the jury found Hughes guilty of felony murder and aggravated burglary, it acquitted him of aggravated robbery and misdemeanor theft. The district court sentenced Hughes to serve life in prison for felony murder and 32 months for aggravated burglary. The district court ordered the aggravated burglary sentence to run consecutive to Hughes' life sentence. Hughes now appeals his convictions directly to this court pursuant to K.S.A. 22-3601(b)(1).

## ANALYSIS

### Hearsay Statements

Hughes asserts that the district court violated his Sixth Amendment right to confrontation by admitting Carapezza's hearsay statements she made to police officers and her cellmates. The State subpoenaed Carapezza to testify at Hughes' trial after she was con-

victed of felony murder, aggravated burglary, aggravated robbery, and theft in Clark's death. Carapezza appeared at trial outside the presence of the jury and invoked her Fifth Amendment right to remain silent. In response, the State gave her use and derivative-use immunity, and the district court ordered Carapezza to testify. Carapezza still refused to testify, and the district court found her in direct contempt and ordered her to remain in the Lyon County jail until she testified or until the end of her life. She continued her refusal to testify until the jury had begun its deliberations, when she informed jail staff that she was willing to testify. Carapezza then told Hughes' counsel that her testimony would aid Hughes. Upon receiving that information, the State withdrew its grant of immunity, and the district court withdrew both the order to testify and the contempt citation. Hughes' counsel was given an opportunity to interview Carapezza regarding her possible testimony but apparently elected not to call Carapezza as a witness. The State likewise elected not to reopen its case to include Carapezza's testimony.

The Sixth Amendment Confrontation Clause requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." When hearsay statements are testimonial, they may be admitted in accordance with the Confrontation Clause only if the declarant was unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004); *State v. Henderson*, 284 Kan. 267, 277, 160 P.3d 776 (2007). Whether a defendant's Sixth Amendment right to confrontation has been violated is a question of law subject to de novo review. 284 Kan. at 276.

Hughes contends that Carapezza's statements to police officers and her cellmates were testimonial. The *Crawford* Court defined testimonial statements to include " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' [Citation omitted.]" *Crawford*, 541 U.S. at 52. Statements made by a witness to a police officer during an interview conducted as part of an investigation are testimonial. *State v.*

*Lackey*, 280 Kan. 190, 201, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006). We have not, however, determined whether a codefendant's confession to a cellmate or another accomplice is testimonial in nature.

*Statements to police officers*

Hughes first argues that the district court erred when it allowed Detective Schondelmaier to testify regarding statements that Carapezza made during an interview with him. Hughes specifically objects to the following portion of Detective Schondelmaier's testimony:

"Q. [County Attorney:] Was that interview that you conducted, was that relative to the checks that had been discovered with her name as the payee?
"A. [Det. Schondelmaier:] Yes, the checks on Mary Clark's account.
"Q. During that interview were you able to determine who she lived with?
"A. Who Marcy Carapezza lived with?
"Q. Yes, sir.
"A. Yes, at that time she said—she identified her boyfriend as being Jason Connor. I later found out that it was Jason Hughes.
"Q. And was the content of that interview relative to those bad checks?
"A. Primarily.
"Q. Did you speak with her at all concerning her knowledge of a Mollie Paico?
"A. Yes.
"Q. Did you question her as to whether she knew the whereabouts of Ms. Paico?
"A. Yes, I did.
"Q. Were you able to determine from that conversation where Ms Paico was?
"Q. I believed that she was in Wichita."

Hughes correctly asserts and the State concedes that Carapezza's statements to Detective Schondelmaier were testimonial and admitted in violation of his Sixth Amendment right to confrontation. Such a violation is subject to a constitutional harmless error analysis, however, which requires us to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. *Henderson*, 284 Kan. at 294. In this case, the admission of the preceding statements did not affect any material issues. Hughes argues that the statements "were critical connecting pieces for the State's case against [Hughes]." This argument overstates, however, the importance of the limited testimony given. A substantial amount of testimony linked Paico, Carapezza, and

Hughes. We therefore conclude beyond a reasonable doubt that the erroneous admission of these statements had little, if any, likelihood of changing the result of Hughes' trial.

*Statements to others*

Hughes relies on dicta from *Crawford* for his assertion that jailhouse confessions are testimonial. The *Crawford* Court referred to the trial of Sir Walter Raleigh as a notorious example of convicting a defendant without allowing the defendant to confront the witnesses against him. Sir Walter Raleigh's alleged accomplice had implicated Raleigh during an examination by the Privy Council and in a letter. The *Crawford* Court criticized the trial, stating that it "has long been thought a paradigmatic confrontation violation." 541 U.S. at 52. Hughes takes this quotation from *Crawford* and applies it out of context to an accomplice's confession. The accomplice confession at issue in Sir Walter Raleigh's trial was directly to the Privy Council, rather than indirectly through a jail cellmate.

Hughes also cites *Lily v. Virginia*, 527 U.S. 116, 144 L. Ed. 2d 117, 119 S. Ct. 1887 (1999) (involving the admission of an accomplice's statements to police); *White v. Illinois*, 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992) (involving the admission of a child victim's statements through various witnesses); and *California v. Green*, 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970) (involving the admission of an accomplice's statements to police). All of these cases were decided before *Crawford* and none of them are factually on point. We consequently do not find them helpful in analyzing this issue.

Hughes additionally cites *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), *State v. Calliham*, 55 P.3d 573 (Utah 2002), and *Commonwealth v. Robins*, 571 Pa. 248, 812 A.2d 514 (2002). *Mechling* involves the admission of a victim's statements to law enforcement officers and a neighbor. The *Mechling* court held that the victim's statements to law enforcement officers were testimonial, and their admission violated the defendant's right to confrontation. However, the *Mechling* court did not specifically rule that the victim's statements to a neighbor were testimonial. The *Mechling* court instead left it to the parties on remand to develop a

thorough record of the circumstances of the statements. The *Mechling* court held that the victim's statements to the neighbor could be testimonial if it was related to what happened and the statements had occurred after a significant lapse of time. 219 W. Va. at 323-24. *Mechling* thus provides no authority for determining whether statements to people other than police officers are testimonial, and the case is not helpful in analyzing the issue before us. *Calliham* is likewise not helpful, because it involved an issue arising from *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), rather than an analysis of whether statements to cellmates are testimonial.

The only case factually similar to the present case is *Robins*. It involved a codefendant's confession to a cellmate, which implicated the defendant by association. The trial court admitted the cellmate's testimony regarding the codefendant's confession but excluded portions of the statement that referred either specifically or by implication to the defendant. 571 Pa. at 518. Analyzing the issue under *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), the *Robins* court held that the cellmate's testimony had been erroneously admitted, because an admission against penal interest was not a firmly rooted hearsay exception and the confession did not bear sufficient indicia of reliability. 571 Pa. at 266, 270. However, the *Robins* court did not address the *Crawford* analysis and did not consider whether the codefendant's confession to a cellmate was testimonial.

Although we have never addressed whether a statement to a cellmate or another accomplice is testimonial, we have held that statements made by a defendant's new girlfriend to the defendant's old girlfriend were not testimonial. See *State v. Miller*, 284 Kan. 682, 713, 163 P.3d 267 (2007). In *Miller*, the State sought to admit the new girlfriend's statements that she loved the defendant and the defendant loved her to prove that the defendant lived a double life by maintaining a relationship with two women. The *Miller* court considered whether the statements were made " 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " 284 Kan. at 713 (quoting *Crawford*, 541 U.S. at 52).

In *State v. Garcia*, 282 Kan. 252, 255, 144 P.3d 684 (2006), one of the defendant's associates kissed another associate on the forehead, stating that he "was part of the family now." The comment occurred immediately after the associate had witnessed the defendant kill someone. The defendant asserted that the admission of the statement violated his right to confront the declarant. This court concluded, however, that one accomplice's statement to another accomplice was not testimonial because it was made in "the absence of any governmental or law enforcement authority and in a nonofficial setting." 282 Kan. at 268.

Considering the test applied in *Miller* and the examples set forth in *Miller* and *Garcia*, we conclude that the statements Carapezza made to her cellmates were not testimonial. We likewise conclude that the statements Carapezza made to Paico while they were in Clark's house were not testimonial. Because the statements were not testimonial, we find Hughes' confrontation claim under *Crawford* unpersuasive.

In the alternative, Hughes argues that Carapezza's statements were not properly admitted pursuant to K.S.A. 60-460. " 'A trial court's determination of whether a statement is admissible under the Kansas hearsay statutes is reviewed by this court for an abuse of discretion, which includes a determination that the trial court's discretion was exercised in light of a correct understanding of the applicable law.' " *Miller*, 284 Kan. at 712 (quoting *State v. Davis*, 283 Kan. 569, 575, 158 P.3d 317 [2007]).

Hughes asserts that the statements made to Carapezza's cellmates were not properly admitted under K.S.A. 60-460(j) because the statements were not against Carapezza's interest. K.S.A. 60-460(j) provides:

"*Declarations against interest.* Subject to the limitations of exception (f) [confessions by the accused], a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

Carapezza's statements to her cellmates were made while she was in jail awaiting trial on charges related to the incident to which she confessed. A reasonable person in Carapezza's position would have understood that such statements could be used against her. It therefore sufficiently subjected Carapezza to criminal liability to qualify as an exception to the hearsay rule under K.S.A. 60-460(j), and the district court did not abuse its discretion by admitting Carapezza's jailhouse confessions as declarations against interest.

Hughes further argues that Carapezza's statements made to Paico while they were in Clark's house were not properly admitted pursuant to K.S.A. 60-460(d), which provides:

"*Contemporaneous statements and statements admissible on grounds of necessity generally*. A statement which the judge finds was made (1) while the declarant was perceiving the event or condition which the statement narrates, describes or explains, (2) while the declarant was under the stress of a nervous excitement caused by such perception or (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

Hughes raises two objections to the admission of Carapezza's statements under K.S.A. 60-460(d). First, he argues that Carapezza was not describing contemporaneous events, because she was describing events that occurred prior to Paico's arrival at Clark's house. Second, Hughes argues that Carapezza was unavailable.

In *State v. Bryant*, 272 Kan. 1204, 1206-07, 38 P.3d 661 (2002), the State admitted evidence that a codefendant's wife overheard her husband ask the defendant why did he "kill those guys." The *Bryant* court held that the codefendant's statements were admissible because of the codefendant's emotional state and the close time frame after the triple homicide was committed.

*Bryant* supports the district court's decision in this case. Paico testified there was chaos in Clark's house after she arrived. Carapezza was physically struggling with Clark, who was screaming and trying to get away, and everyone was yelling and screaming at one another. In addition, Paico testified that Carapezza was crying. Under these facts, it is clear that Carapezza, like the codefendant in

*Bryant,* was under the nervous stress and excitement caused by the ongoing aggravated robbery at Clark's house. K.S.A. 60-460(d)(2) does not require that the declarant be unavailable. It does not matter whether Carapezza was available as a witness; because Carapezza's statements to Paico while they were in Clark's house qualify as excited utterances, the district court did not abuse its discretion by admitting them.

### Drug use as res gestae

Hughes argues that the district court erroneously admitted evidence of his drug use and addiction. The district court admitted the evidence as res gestae, stating that it was part of an "overall scheme to obtain money for drugs."

The first step in considering a challenge to the admission of evidence is to determine whether the evidence is relevant. *State v. Gunby,* 282 Kan. 39, 47, 144 P.3d 647 (2006). All relevant evidence is admissible unless prohibited by statute. K.S.A. 60-407(f). Relevant evidence is any "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish. 282 Kan. at 47.

After relevance is established, the second step requires the application of the statutory rules governing the admission and exclusion of evidence. These rules are applied either as a matter of law or in the exercise of the district court's discretion, depending on the rule in question. *Gunby* did not establish our standard of review for analyzing relevance—in particular, the probative element—of certain K.S.A. 60-455 evidence. As set forth in our recent decision in *State v. Reid,* 286 Kan. 494, Syl. ¶ 5, 186 P.3d 713 (2008), we concluded that our standard of review of "the probative element" of 60-455 evidence is abuse of discretion. In *Reid,* we clarified the analytical steps to be taken when considering 60-455 evidence and our standard of review applicable to each step.

"[T]he K.S.A. 60-455 analysis requires several steps. . . . [T]he court must determine that the evidence is relevant to prove a material fact, *e.g.,* motive, knowledge, and identity. The court must also determine that the material fact is dis-

puted. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in." 286 Kan. at 503.

Res gestae is no longer accepted as a valid basis for independently admitting evidence. 282 Kan. at 63. The district court in the present case thus erroneously admitted the evidence of Hughes' drug usage and addiction as res gestae without applying the analysis required by K.S.A. 60-455.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Before the district court can admit evidence of another crime or civil wrong, it must determine whether the evidence is relevant to prove a disputed material fact and whether the probative value outweighs the prejudicial effect. 282 Kan. at 48, 57. The State argues that evidence of drug usage and addiction was relevant to establish motive. "Motive is the moving power which impels one to action for a definite result . . . . Motive is that which incites or stimulates a person to do an action." *State v. Jordan*, 250 Kan. 180, 190, 825 P.2d 157 (1992) (quoting *State v. Ruebke*, 240 Kan. 493, 502, 731 P.2d 842, *cert. denied* 483 U.S. 1024 [1987]). According to the State's theory, Hughes, Paico, Carapezza, and Bennett robbed Clark so they could fuel their addictions to crack cocaine.

Hughes argues to the contrary that the evidence was not relevant to establish a motive for the burglary and robbery because the motive is inherent in the commission of those crimes. Hughes reasons that the motive was obviously financial gain, and it was irrelevant how the money would be used. In essence, Hughes argues that a secondary motive is irrelevant when the primary motive is obvious.

This is an issue of first impression in Kansas. Although intent is an element of aggravated burglary and aggravated robbery, motive is not an element. Motive and intent are not the same thing. The State may nevertheless admit evidence of motive to explain why the defendant may have committed the crime or crimes at issue even though motive is not an element of the offense. *Ruebke*, 240 Kan. at 502-03 (allowing the admission of other-crimes evidence to explain that defendant committed murder to prevent witnesses from identifying him and causing his probation to be revoked). See also *Jordan*, 250 Kan. at 191 (admitting evidence of a prior crime to establish the defendant's motive for going to the apartment where he later committed murder). But see *State v. Tolson*, 274 Kan. 558, 565, 56 P.3d 279 (2002) (admitting evidence that the defendant previously possessed drugs and guns to show knowledge and intent but concluding the evidence was not admissible to show motive because it did not imply the defendant would use the gun to cause trouble).

The evidence of Hughes' drug use is probative of the motive for robbing Clark. Hughes denied the allegations, testifying that he did not know Clark and had never been to her house. Providing a motive for Hughes' involvement establishes a material or logical connection to the inference that Hughes participated in the crime. The evidence was therefore relevant to establish motive, regardless of whether it was the primary motive—money—or the secondary motive—buying drugs.

Several other courts have allowed evidence of drug usage or addiction to establish motive. See, *e.g.*, *United States v. Cody*, 498 F.3d 582, 590-91 (6th Cir. 2007) (admitting testimony from the defendant's wife and son regarding the family's drug use to establish the defendant's motive for robbing a bank); *State v. Armstrong*, 176 Ariz. 470, 473, 862 P.2d 230 (1993) (admitting a taped statement with defendant's admission to prior drug transactions because it was relevant to defendant's motive to traffic in stolen property); *Craft v. Stratton*, 2007 WL 3144855, at *11-12 (N.D. Cal. 2007) (unpublished opinion) (admitting evidence of defendant's drug use to establish defendant's motive for robbing and killing victim); *State v. Jarrett*, 137 N.C. App. 256, 261, 527 S.E.2d 693 (2000)

(allowing prosecutor to characterize defendant as a "crack head" because prosecutor was free to argue defendant had robbed and shot the victim to obtain money for drugs); *People v. Wood*, 245 App. Div. 2d 200, 666 N.Y.S.2d 599 (1997) (admitting testimony of defendant's drug addiction to establish defendant's motive for robbing his mother and the mother's reason for testifying against her son); *Washington v. State*, 2007 WL 1412903, at *3 (Tex. App. 2007) (unpublished opinion) (admitting evidence that defendant traded a stolen van for crack cocaine because it made the fact or consequence that defendant committed aggravated robbery more probable by providing motive). But see *State v. Boman*, 123 Idaho 947, 950-51, 854 P.2d 290 (Ct. App. 1993) (holding that bare allegation that defendant's drug addiction was relevant to prove motive was nothing more than speculation, but affirming defendant's conviction because the error in admitting the evidence was harmless). Here, the trial court did not abuse its discretion in finding that Hughes' drug use was relevant.

After determining relevance, we must consider whether the probative value of the evidence outweighed its prejudicial effect. *Gunby*, 282 Kan. at 48, 57. This part of the evidentiary analysis is also reviewed for abuse of discretion. *Reid*, 286 Kan. 494, Syl. ¶ 8; *Garcia*, 285 Kan. at 18 (citing *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 [2004]). The burden of proof is on the party alleging that discretion is abused. *Reid*, 286 Kan. 494, Syl. ¶ 9; *Garcia*, 285 Kan. at 18-19.

The evidence of Hughes' drug use may have been damaging in the minds of the jurors, and other evidence exists that he had a motive to commit robbery for financial reasons unrelated to purchasing drugs. However, as previously noted, there is sufficient evidence in the record to establish a nexus between the financial motive and the necessity to purchase the drugs to fuel his addiction. Further, Hughes' drug use was obvious and referenced throughout the trial. Hughes himself testified to using crack cocaine 4 to 5 days per week and marijuana daily. Hughes also admittedly associated with people who used drugs. In addition, Hughes failed to object when some of his associates testified that Hughes used crack and marijuana. Hughes also failed to object when police testified that

Hughes, Carapezza, Paico, and their other associates lived in an area with a high incidence of drug use and were known to use crack cocaine. The chief of police testified without objection that crack cocaine was one of the two primary drugs responsible for most of the crime in the city. In weighing whether the probative value of the admission of drug evidence outweighs its prejudicial effect, Hughes has not shown that the trial court abused its discretion in admitting the testimony.

For the last step of the 60-455 analysis, we address the absence of a limiting instruction in this case under the clearly erroneous standard. Not including a limiting instruction informing the jury that it could only consider Hughes' drug use to the extent it was probative of motive was error. However, as we just discussed, his drug use was obvious and referenced throughout the trial. As a result, we are not able to declare a real possibility existed that the jury would have returned a different verdict if the trial error had not occurred.

### Evidence of Prior Unrelated Forgeries

Hughes argues that the district court erred when it admitted evidence that Carapezza attempted to cash checks against Tom McBride's closed checking account. The district court concluded that the evidence was relevant to establish Hughes' motive and plan. Although he objected to the testimony from the police officer who interviewed the bank manager and to the admission of bank records, including a copy of Carapezza's driver's license and the checks, Hughes failed to object to the testimony from the bank manager who reported the transaction. A party must make a timely and specific objection in order to preserve for appeal an issue relating to the admissibility of evidence. K.S.A. 60-404; *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006) (defendant precluded from raising issue regarding the admission of evidence pursuant to K.S.A. 60-455 because defendant failed to object to evidence at trial). Hughes failed to preserve this issue for appeal.

### Expert testimony

Hughes next argues that the district court erred when it allowed the State to present testimony from an expert regarding the be-

haviors of people addicted to crack cocaine. The State presented evidence from Dr. Eljorn Don Nelson, a professor of clinical pharmacology and cell biophysics at the University of Cincinnati College of Medicine, an associate director of the Drug and Poison Information Center, and a career teacher in the Addictions Fellowship at the National Institute of Drug Abuse.

Dr. Nelson testified that crack cocaine is prepared exclusively for purposes of abuse. He further testified that crack cocaine creates a short-term euphoric response caused by the release of dopamine and then stimulates a fight-or-flight response, which tends to make users more paranoid, hostile, and aggressive. Because the euphoric response is fairly short, users may smoke crack cocaine for several days at a time before becoming completely exhausted, irritable, nervous, and anxious. To relieve their nervousness and anxiety, many users take sedatives and crash, sleeping for long periods of time.

According to Dr. Nelson, crack cocaine impairs judgment and interferes with normal activities by interrupting transmissions to the forebrain. Crack users become suspicious of other people and have little ability to test reality. Using crack becomes the highest priority in their lives. Dr. Nelson testified that obtaining crack becomes an overwhelming preoccupation, explaining that users will continue using the drug even though they experience negative consequences. People who use crack are more likely to become violent, especially when their drug-seeking behaviors are unsuccessful. Dr. Nelson testified that he had seen people "go the extent of robbing people on the street to obtain crack cocaine."

Hughes argues that Dr. Nelson's expert testimony was unnecessary to aid the jury's understanding of crack cocaine use. According to Hughes, "it is common knowledge that persons who are addicted to drugs are likely to engage in improper and even illegal conduct to attempt to support the habit." Hughes further argues that, even if the evidence were admissible to show that a person with a particular medical condition is more likely to commit a charged crime, the evidence is not admissible in this case because Hughes was never diagnosed with the medical condition of drug addiction.

The first question in determining the admissibility of evidence is relevance. If the evidence is relevant to a material fact, it may be admitted in accordance with the rules of evidence. This court reviews the admission of expert testimony pursuant to K.S.A. 60-456 under an abuse of discretion standard. *State v. Oliver*, 280 Kan. 681, 693-94, 124 P.3d 493 (2005).

In *State v. Clements*, 244 Kan. 411, 770 P.2d 447 (1989), the defendant was charged with aggravated criminal sodomy. The State elicited testimony from an expert, who described the typical characteristics of individuals who sexually abuse children and created the inference that the defendant fit the profile of a pedophile. In closing argument, the prosecutor tied the expert witness' general profile of sexual offenders to the defendant. The *Clements* court reversed the defendant's conviction, concluding that the expert's testimony was not relevant because it did not assist the jury in determining whether the child was sexually abused by the defendant. 244 Kan. at 421. See also *State v. Price*, 30 Kan. App. 2d 569, 581, 43 P.3d 870 (2002) (defendant could not present expert testimony of characteristics of sex offenders to show he did not share those characteristics, because the evidence was not relevant).

In *State v. Cheeks*, 253 Kan. 93, 853 P.2d 655 (1993), the defendant was charged with felony murder based on child abuse. The State presented evidence from a child abuse expert, who described crying and defecating or urinating as the two most common behaviors that precipitate child abuse. The expert then tied these typical behaviors to the defendant and the victim. The *Cheeks* court held that the expert's testimony was not relevant to determine whether the defendant committed felony murder. The *Cheeks* court noted that the inference from the expert's testimony was that because the 16-month-old victim cried and defecated on the day she died, the defendant must have killed her. Concluding that the inference was impermissible, the *Cheeks* court held that the district court abused its discretion in admitting the evidence and reversed the defendant's conviction. 253 Kan. at 102-03.

*Clements* and *Cheeks* stand for the proposition that behavioral profile evidence is not admissible to imply guilt by showing that the defendant falls within the profile. This court arrived at a dif-

ferent result, however, in *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993), where it concluded that the district court properly admitted expert testimony regarding the typical behavior of gang members to establish the defendant's motive for committing murder. The State's theory was that the defendant shot the victim to avenge an injury to a fellow gang member. To demonstrate this theory, the State's expert on gang behavior testified that Asian gangs are likely to retaliate and that the means of retaliation could include violence. Distinguishing *Clements*, the *Tran* court concluded that the evidence was helpful to the jury and relevant to explaining the defendant's actions. 252 Kan. at 502. The *Tran* court analogized the admission of gang evidence to show motive to the admission of gang evidence to show bias. 252 Kan. at 505. See also *State v. Toney*, 253 Kan. 651, 862 P.2d 350 (1993) (allowing expert testimony regarding gang profiles to establish motive). But see *State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995) (expert testimony regarding gang profiles was error because no evidence suggested gang involvement or gang motivation).

The expert testimony at issue in this case is more analogous to the profile testimony in *Clements* and *Cheeks* than that allowed in *Tran*. Like the evidence in *Clements* and *Cheeks*, Dr. Nelson's testimony did not help the jury determine whether Hughes burglarized Clark's house and robbed and killed her. The only inference from Dr. Nelson's testimony is that crack cocaine addicts will do anything to obtain the drug, so Hughes must have committed the crimes because he is a crack addict. Like the inference in *Cheeks*, this inference is impermissible. The district court abused its discretion in admitting Dr. Nelson's testimony.

This court has considered harmless-error analysis in other cases involving the admission of expert testimony. See, *e.g. State v. Mullins*, 267 Kan. 84, 97, 977 P.2d 931 (1999) (admission of expert's testimony regarding whether victim had been coached was error but error was harmless); *Cox*, 258 Kan. 577 (admission of expert testimony regarding gang profiles was harmless error). K.S.A. 60-261 requires the court to find the erroneous admission of evidence to be harmless error unless the error affects the defendant's substantial rights.

In the present case, no physical evidence linked Hughes to the crime scene. The State's principal evidence against Hughes came from Paico, a codefendant whose credibility was questionable due to discrepancies between her prior statements and her trial testimony and due to her favorable plea agreement, which limited her sentence to 60 months if she testified against Hughes and her other codefendants. The only other evidence linking Hughes to the crimes came from jailhouse informants, who testified that Hughes' girlfriend, Carapezza, had admitted participating in the crimes. The State's theory was that Hughes, Carapezza, Paico, and Gail Bennett were crack cocaine addicts, willing to rob and kill Clark to get more drugs. Dr. Nelson's testimony simply provided an expert's opinion about propensity in order to bolster the State's theory. That evidence was highly prejudicial, especially when combined with the evidence that Hughes, Carapezza, Paico, and Bennett used crack cocaine. This court cannot conclude that the error did not affect Hughes' substantial rights.

Because the expert testimony relating to the propensity of cocaine addicts to commit violent crimes was not relevant and because it undermined Hughes' right to a fair trial, the convictions must be reversed.

### Derivative-Use Immunity

Shortly after Clark's death, Hughes appeared at an inquisition into the murder. Hughes received use and derivative-use immunity for his testimony. Hughes argues on appeal that the State violated his Fifth Amendment right against self-incrimination by using his immunized inquisition testimony against him. Although the State did not attempt to admit any of Hughes' inquisition testimony during the trial, Hughes argues that the State failed to establish that each and every piece of evidence was based on a legitimate source independent of Hughes' inquisition testimony.

Hughes objected to the use of his immunized inquisition testimony before trial, and the district court held a hearing to determine whether the State had violated Hughes' rights. After hearing evidence from two police officers and Paico's attorney, the district court concluded that there was no evidence offered during

Hughes' inquisition that had not otherwise been obtained from Carapezza's and Paico's statements to law enforcement officers prior to Hughes' inquisition testimony. In addition, the district court found that there were no additional witnesses who were made known to the police as a result of Hughes' inquisition testimony.

In order to establish that its evidence is not tainted by the use of a defendant's immunized testimony, the State has the burden of proving it had a legitimate, independent source for the disputed evidence. The burden of proof on the State is an affirmative duty to prove that the evidence it plans to use is derived from "a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460, 32 L. Ed. 2d 212, 92 S. Ct. 1653 (1972). A by-product of the Fifth Amendment is that *Kastigar* may require a trial within a trial—or a trial before, during, or after the trial—if such a proceeding is necessary for the court to determine whether the government has in any fashion used compelled testimony to indict or convict a defendant. See *United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990).

When asked to review the violation of a defendant's Fifth Amendment right against self-incrimination, this court reviews the district court's factual findings using a substantial competent evidence standard, but the ultimate legal conclusion is reviewed as a question of law using an unlimited standard of review. *State v. Bell*, 280 Kan. 358, 362, 121 P.3d 972 (2005).

Because this court is remanding the case for new trial, it serves little purpose to reexamine the State's evidence presented in the first trial to determine whether it was the product of immunized testimony. The district court is directed to conduct a renewed hearing or hearings with respect to the use of such testimony. At any such hearing, the burden will be on the State to demonstrate that no part of its case was or will be derived from the immunized testimony.

In conducting this hearing, the district court is to be mindful of certain principles. "[Use immunity] prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Kastigar*, 406 U.S. at 453. At the hearing, the government must dem-

onstrate that it obtained all of the evidence it proposes to use from sources independent of the compelled testimony. See *North,* 910 F.2d at 854. The district court must make specific findings on the independent nature of the proposed evidence. 910 F.2d at 855-56. No use at all may be made of the immunized testimony. 910 F.2d at 862. The fact that other witnesses were exposed to immunized testimony may suffice to taint their testimony. 910 F.2d at 863-64.

Although such tight restrictions on the use of immunized testimony may jeopardize the State's case, this court notes the caveat of the Ninth Circuit Court of Appeals in recommending caution in conducting immunized hearings:

"The government must occasionally decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution. If the government chooses immunization, then it must understand that the Fifth Amendment and *Kastigar* mean that it is taking a great chance that the witness cannot constitutionally be indicted or prosecuted." 910 F.2d at 862.

### Cumulative Errors

Hughes submits as a final issue that the trial errors, even if found to be harmless in isolation, combine to constitute prejudicial error. Because this court is reversing the convictions based on improper expert testimony, it will not need to determine whether the errors cumulatively amounted to reversible error.

### Conclusion

We reverse the convictions and remand for a new trial. Such a trial is to be conducted without expert testimony pertaining to the propensity of cocaine users to commit crimes. The district court is to conduct a hearing or multiple hearings to determine whether testimony proffered or introduced by the State violates the Fifth Amendment prohibition against self-incrimination.

LUCKERT, J., concurring in part and dissenting in part: I respectfully disagree with the majority's conclusion that the erroneous admission of Dr. Nelson's expert testimony requires the reversal of Hughes' convictions. In all other respects, I agree with the majority opinion, including the conclusion that the profiling testimony of the expert witness was inadmissible.

The majority, in concluding Hughes' convictions should be reversed, opined that Hughes' substantial rights were violated by the admission of Dr. Nelson's testimony. See K.S.A. 60-261 (harmless error rule; no error in admission of evidence is ground for disturbing judgment "unless refusal to take such action appears to the court inconsistent with substantial justice"). This opinion was largely based upon the majority's perception that the evidence against Hughes was relatively weak. Although the evidence came primarily from codefendant Mollie Paico, there was evidence to substantiate her version of events. In addition, Hughes' girlfriend's statements to cellmates implicated him in the murder. In my view, this evidence is sufficient for a jury to find beyond a reasonable doubt that Hughes was guilty.

In addition, the majority noted that Dr. Nelson's testimony regarding crack cocaine was prejudicial. Yet, the record is replete with evidence regarding drugs and drug use, much of it admitted without objection. Given the pervasive theme of drugs throughout the trial, it seems very questionable that the expert testimony was so prejudicial as to violate substantial rights. In fact, Hughes' own arguments suggest he does not perceive that Dr. Nelson's testimony added to information otherwise available to the jury. Rather, he argues Dr. Nelson's testimony should have been excluded because his opinion was unnecessary to aid the jury's understanding of crack cocaine. In other words, while Dr. Nelson's testimony added scientific insight into why crack impacts users, much of his testimony related to matters within the common knowledge of a juror.

I agree with Hughes' argument that Dr. Nelson's expert testimony added little to the understanding of the case. And, while his testimony made little difference, the evidence against Hughes, while not overwhelming, was strong. Therefore, I would conclude that the admission of his testimony did not deny Hughes substantial justice. The standard of K.S.A. 60-261, stating that a new trial shall not be granted on the basis of the erroneous admission of evidence unless the error affects the substantial rights of the parties, is not met.

MᴄFᴀʀʟᴀɴᴅ, C.J., and Nᴜss, J., join in the foregoing concurring and dissenting opinion.

Jᴏʜɴsᴏɴ, J., concurring in part and dissenting in part: I concur in the result reached by the majority. Where I depart is in the majority's application of the hearsay exception of K.S.A. 60-460(j) to a jailhouse confession to a cellmate.

First, I would note an apparent contradiction in the majority's application of the objective declarant standard to codefendant Marcy Carrapezza's statements to her cellmate. In deciding that admission of the statements did not violate the Confrontation Clause, the majority relies on the *Miller* test of whether an objective person in declarant's circumstance would believe that his or her statements would be available for use at a later trial. See *State v. Miller*, 284 Kan. 682, 163 P.3d 267 (2007). The majority apparently found that the statements did not pass that test, *i.e.*, that Carrapezza had no rational belief that her statements to a cellmate would be trial evidence. In contrast, in deciding that the statements fell within the declaration against interest exception to the hearsay rule, the majority opined that a reasonable person in Carrapezza's position would have understood that her statements could be used against her, presumably as trial evidence. I would not find that a rational person would have been of two different minds as to the ultimate destination of his or her statements. Rather, I would find that Carrapezza did not objectively believe that her statements would make their way to the courtroom.

I perceive the jailhouse society to be markedly different from that of the outside community. Whereas admitting to participation in a murder may make "the declarant an object of hatred, ridicule or social disapproval in the [outside] community," as set forth in K.S.A. 60-460(j), such a declaration, whether a true admission or merely inmate bravado, may well enhance one's standing among the denizens of a penal facility. Therefore, the rationale for the exception is not present in this context.

Moreover, one perceives that penal community mores discourage, if not prohibit, the sharing of a cellmate's confession with persons in authority. Thus, a reasonable person in Carapezza's po-

sition would not normally have understood that her statements would be used against her in a court of law.

Granted, an inmate may not feel constrained to conform to such a rule of silence if he or she could glean a significant personal benefit from talking with law enforcement. However, that snitching-for-personal-gain scenario would then call into question the trustworthiness of the hearsay declaration. Nevertheless, the objective expectation of the declarant would still be that the statements to a cellmate would not have been used against him or her. I would find that the statements are not insulated from the hearsay rule by K.S.A. 60-460(j).