(208 P.3d 317)
No. 98,411

STATE OF KANSAS, *Appellee*, v. DANIEL S. ULREY, *Appellant*.

Opinion filed May 29, 2009.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for the appellant.

*Benjamin J. Fisher*, senior assistant district attorney, *Keith E. Schroeder*, district attorney, and *Stephen N. Six*, attorney general, for the appellee.

Before GREENE, P.J., PIERRON and STANDRIDGE, JJ.

PIERRON, J.: Daniel S. Ulrey appeals from his convictions of possession of anhydrous ammonia with the intent to manufacture a controlled substance and possession of drug paraphernalia with the intent to manufacture a controlled substance. Ulrey contends

the evidence used against him was seized by an unlawful search of the vehicle in which he was riding. Ulrey also contends the trial court improperly admitted hearsay laboratory test results at trial. We affirm.

On September 22, 2004, Deputy Matt Tatro of the Reno County Sheriff's Department was on routine patrol. At approximately 9 a.m., he saw a vehicle pass him driven by Barbara Jordan. He knew Jordan from two recent arrests for driving on a revoked license. Deputy Tatro confirmed with the dispatcher that Jordan's driver's license was still revoked. He activated his emergency lights, but Jordan continued driving for approximately ½ mile and pulled into the driveway of her home.

Jordan exited her car immediately and made contact with Deputy Tatro in front of the patrol car. Immediately thereafter, two male passengers exited Jordan's vehicle as well. Deputy Tatro asked the men, who were walking towards him, to stand at the front of Jordan's vehicle. Jordan admitted right away that she knew she was not supposed to be driving. Because he was outnumbered, Deputy Tatro placed Jordan in the back seat of the patrol car and then contacted the two men. The men were identified as Jason Wright and Daniel Ulrey. Wright had been sitting in the front passenger seat and Ulrey had been in the back seat on the driver's side. Neither man had any outstanding warrants. Because both men also had suspended driver's licenses, Deputy Tatro, after consulting with Jordan, advised the men they could stay at Jordan's house or use her home phone to call for a ride.

After releasing the two men, Deputy Tatro went to Jordan's vehicle to retrieve her purse so it could be taken to the detention center per police department policy. Deputy Tatro testified that he previously told Jordan he would retrieve her purse from the car and she agreed that he could do that. Later, Deputy Tatro testified he did not remember whether he asked Jordan for consent to retrieve her purse, or whether he simply told her he was going to get it from the car.

Looking in the driver's window, Deputy Tatro saw the purse on the floorboard on the passenger side of the car. He walked around

the car to the passenger side to get it. Before opening the door, he noticed an odor of anhydrous ammonia, which he had dealt with in the past, coming from the car. Without opening the car door, Deputy Tatro also saw a jug on the floor in the back seat, and the top of a box of salt and a kitchen strainer in a crate in the back seat. He opened the passenger door, at which time the odor of anhydrous ammonia became overwhelming. Deputy Tatro and his back-up officer immediately put Wright and Ulrey in handcuffs. They were apparently still at the vehicle. The officer found a baggie of a white powdery substance on Wright after a pat-down search.

Deputy Tatro returned to Jordan's vehicle and removed a red and white 1-gallon water jug. Inside the jug was a substance that smelled like anhydrous ammonia. He found a red milk crate in the back passenger seat containing various items, including a box of Morton salt, a baggie with peeled lithium batteries, and an ice cream tub with coffee filters containing residue. Inside another bag, he found a glass jar which contained a dark liquid. The crate also contained a wooden mixing spoon with residue. A search of the vehicle's trunk resulted in the discovery of an 18-quart cooler with camping fuel, two Mason jars with a purple and bluish liquids, and another mixing spoon. All of these items are commonly used in the manufacture of methamphetamine.

Deputy Tatro *Mirandized* Ulrey, who agreed to cooperate. Ulrey indicated he did not know what items were in the vehicle other than his guitar, and he had caught a ride to go fishing and drink beer. There was no beer or fishing equipment in the vehicle. At the jail, other baggies were found on Wright's person, which field-tested positive for methamphetamine. Nothing was found on Ulrey's person when he was searched at the jail.

In October 2004, Ulrey was charged with one count of manufacture of methamphetamine, in violation of K.S.A. 65-4159 or, in the alternative, one count of attempted manufacture of methamphetamine, in violation of K.S.A. 65-4159 and K.S.A. 21-3301; one count of possession of ephedrine with the intent to manufacture a controlled substance, in violation of K.S.A. 65-7006; one count of possession of lithium with the intent to manufacture a controlled substance, in violation of K.S.A. 65-7006; one count of possession

of anhydrous ammonia with the intent to manufacture a controlled substance in violation of K.S.A. 65-7006; felony possession of drug paraphernalia with the intent to manufacture a controlled substance, in violation of K.S.A. 65-4152(a)(3); and one count of possession of methamphetamine, in violation of K.S.A. 2004 Supp. 65-4160.

At the preliminary hearing, Deputy Tatro testified as set forth above. He testified that based on his training and experience, the items he found in the vehicle were consistent with the manufacture of methamphetamine. He also testified that the residue on the coffee filters in the back seat contained a finished product of methamphetamine and lithium. The only objection made during this testimony was an objection based on foundation.

Ulrey was bound over for trial on all charges. He filed a motion to suppress the physical evidence found in Jordan's vehicle and any statements he made to officers. Ulrey asserted he was unlawfully detained as a passenger of the car for a prolonged period for what was originally a traffic infraction. Ulrey also claimed that Deputy Tatro unlawfully entered Jordan's vehicle without consent or a search warrant. Finally, Ulrey claims he was not properly *Mirandized* and, therefore, any statements he made were inadmissible as he did not voluntarily waive his *Miranda* rights.

Deputy Tatro testified again at a June 2006 suppression hearing. His testimony largely mirrored that which he gave at the preliminary hearing. He testified that he briefly detained Ulrey and Wright after arresting Jordan. Once he had confirmed they had no outstanding warrants, he told them they were released and could go into Jordan's house. Deputy Tatro did not recall how long this took.

Deputy Tatro testified he walked to the car to retrieve Jordan's purse, saw it on the passenger side floorboard, and walked around to the passenger side of the vehicle. The windows of the vehicle were down and he smelled what he recognized to be anhydrous ammonia. From outside the car, he saw a red milk crate in the back seat with a kitchen strainer and a box of Morton salt and a water jug. At this point Deputy Tatro and another officer handcuffed Ulrey and Wright based on the officers' belief that Ulrey and Wright were involved in the manufacture of methampheta-

mine. Ulrey was read his *Miranda* rights. Deputy Tatro then searched the car based on probable cause and the additional items were found.

After hearing the evidence, the district court denied the motion to suppress, finding the initial stop was lawful and Deputy Tatro had done nothing improper.

The case proceeded to a jury trial on August 23 and 24, 2006. The arresting and crime scene officers testified regarding the traffic stop and ultimate search of the vehicle. In addition, Chris Riddle, a forensic chemist for the Kansas Bureau of Investigation (KBI), testified for the State. Riddle, without objection, presented a PowerPoint presentation about the process of manufacturing methamphetamine. Riddle also testified that each report prepared by a KBI chemist is reviewed by another scientist in the KBI laboratory. The items in this case were tested by KBI scientist Krista Rankin, and Riddle reviewed her findings and reports. Riddle testified that the notes and reports were kept in the ordinary course of business at the KBI.

As Riddle began testifying about Rankin's report, Ulrey objected on grounds of hearsay and foundation. The objection was denied. Ulrey also lodged a continuing objection to Riddle's testimony about the actual items tested "pursuant to [the] pretrial motion." This continuing objection also related to the subsequent testimony of the law enforcement officers. Riddle identified various items collected, including salt; lithium; methamphetamine, pseudoephedrine, and lithium in a condition consistent with completion of a partial state of the manufacturing process; sulfuric acid; bottles of solvents typically used in the manufacturing process; and various exhibits containing methamphetamine, pseudoephedrine, and other manufacturing components consistent with the gassing stage of manufacture of methamphetamine.

The jury ultimately acquitted Ulrey of all charges except possession of anhydrous ammonia and possession of drug paraphernalia, both with the intent to manufacture methamphetamine. His subsequent motions for judgment of acquittal and for new trial were denied. Based upon Ulrey's criminal history score of I, he

was sentenced to 12 months' probation, with an underlying prison term of 11 months on each count to run concurrently.

Within 5 months of his original sentencing, the State filed a motion to revoke Ulrey's probation on the grounds he had tested positive for methamphetamine use several times during his probation. Ulrey's probation ultimately was revoked and he was ordered to serve his 11-month prison sentence.

On appeal, Ulrey contends that Deputy Tatro's search of Jordan's vehicle after she was arrested and he was detained was illegal, warranting the suppression of all the evidence seized from the vehicle. Ulrey contends he has standing to object to the search of Jordan's vehicle.

An appellate court reviews the district court's decision on a suppression motion using a bifurcated standard. Without reweighing the evidence, the appellate court reviews the district court's findings to determine whether they are supported by substantial competent evidence. The appellate court then reviews the ultimate legal conclusion regarding the suppression of evidence using a de novo standard. *State v. Woolverton,* 284 Kan. 59, 70, 159 P.3d 985 (2007).

In claiming he has standing to challenge the search of Jordan's vehicle, Ulrey relies on *Brendlin v. California,* 551 U.S. 249, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007). However, Ulrey's argument extends *Brendlin* beyond its facts. In *Brendlin,* police pulled over a vehicle with a proper temporary tag for the sole purpose of seeing if the tag matched the vehicle. Brendlin was a passenger in the car, which the court found was illegally stopped without reasonable suspicion. The officer recognized Brendlin and confirmed there was an outstanding warrant for him for a parole violation. After seeing Brendlin open and then close his car door, officers ordered Brendlin out of the car at gunpoint and arrested him. Brendlin was searched incident to arrest as was the driver, and both were found to have contraband on their persons; the car was then searched incident to arrest.

The United States Supreme Court held that a passenger in a vehicle is "seized" for Fourth Amendment purposes whenever the vehicle is stopped by police. Because the State conceded the stop

of the vehicle was unlawful, the court found the vehicle passengers had standing to challenge their detention and the fruits of that illegal detention. 551 U.S. at 259.

Once an officer lawfully detains a vehicle for a traffic violation, the officer may order the driver out of the vehicle without any reasonable suspicion that the driver poses a safety risk. *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977). In *Maryland v. Wilson*, 519 U.S. 408, 414-15, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997), the Supreme Court applied the same rule to passengers. Likewise, in *Brendlin*, the Supreme Court recognized that *Mimms* and *Wilson* were focused on officer safety. This justified the officer to exercise " 'unquestioned command of the situation.' [Citation omitted.] *Brendlin*, 551 U.S. at 258.

In *Arizona v. Johnson*, 555 U.S. 323, 172 L. Ed 2d 694, 129 S. Ct. 781 (2009), the United States Supreme Court addressed the detention and patdown of a passenger during a routine traffic stop. The Supreme Court held that in a traffic-stop setting, "it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." 555 U.S. at 327. The Supreme Court continued, noting:

"The temporary seizure of driver *and passengers* ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. [Citation omitted.] An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. [Citation omitted.]" (Emphasis added.) 555 U.S. at 333.

In *Johnson*, the officer stopped the vehicle for a registration violation and began questioning the passenger about his gang membership. The court found this questioning was legal because it did not measurably extend the duration of the stop. 555 U.S. at 332-34. In this case, Deputy Tatro lawfully could control the situation by ordering Ulrey and Wright to wait at the front of Jordan's

car while he met with and confirmed Jordan's identity and arrested her for driving while license suspended.

However, by thereafter checking the identification of Ulrey and Wright and running a warrant check on the passengers, Deputy Tatro did measurably extend the duration of the stop. See *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185, 159 L. Ed. 2d 292, 124 S. Ct. 2451 (2004); *INS v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984). However, even in these cases the encounter must be either voluntary or reasonable suspicion must exist. See *State v. Pollman*, 286 Kan. 881, 889, 190 P.3d 234 (2008).

The continued detention of Ulrey and Wright after Jordan's arrest was not voluntary and Deputy Tatro took Wright's identification and otherwise made it clear that the men were not free to leave. See *Pollman*, 286 Kan. at 889.

Once, however, the warrant check came back negative on the two men, Deputy Tatro advised them they were free to leave and obtained permission from Jordan for them to stay at her house and/or use her telephone. Neither man was searched at this time and Deputy Tatro no longer exerted any show of authority. At this point, no reasonable person would have felt compelled to stay and the detention had ended.

The question then becomes whether there is any causal connection between Ulrey's brief illegal detention and Deputy Tatro's subsequent discovery of evidence in plain view in Jordan's car. As a panel of this court recently noted:

"The Kansas Supreme Court states that 'a court may find that the poisonous taint of an unlawful search or seizure has dissipated because the connection between the unlawful law enforcement conduct and the challenged evidence became attenuated.' *State v. Martin*, 285 Kan. 994, Syl. ¶ 3, 179 P.3d 457 (2008). We examine 'the causal chain between unlawful conduct and the acquisition of evidence.' 285 Kan. 994, Syl. ¶ 4. Three factors are commonly used to judge attenuation: (1) the time elapsed between the illegal conduct and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the 'purpose and flagrancy' of the official misconduct. [Citation omitted.]" *State v. Morlock*, 40 Kan. App. 2d 216, 265, 190 P.3d 1002 (2008), *rev. granted* 287 Kan. 768 (2009).

Here, Ulrey was no longer a passenger in the car and had been advised after a records check that he was free to leave. He was

even told he could enter Jordan's home and call for a ride if he wished. Because his detention had terminated without the finding of any incriminating evidence, there were intervening circumstances to purge any taint of the brief, illegal detention, even though Deputy Tatro's return to Jordan's car occurred immediately after Ulrey's release. At this point, Ulrey was free to depart and probably lost any standing to object to the search of Jordan's car. See *Rakas v. Illinois*, 439 U.S. 128, 134, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978) (a passenger normally does not have standing to object to the search of a vehicle in which he or she had no ownership or possessory interest). Thus, if there is no legitimate basis for the passenger to challenge the initial detention of the vehicle, he or she likely has no standing to object to the search of a vehicle lawfully detained. See *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1150 (9th Cir.), *cert. denied* 552 U.S. 1031 (2007); see also *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007), *cert. denied* 552 U.S. 1123 (2008) (although the passenger can challenge the initial detention and the search of his or her person, *Brendlin* is unclear concerning the degree to which the passenger can challenge a search of the vehicle); *United States v. Martinez*, 537 F. Supp. 2d 1153 (D. Kan. 2008) (*Rakas* standard that passenger normally has no standing to the search of another person's vehicle is still valid law after *Brendlin* if there is no challenge to the initial detention of the vehicle in which the passenger is riding).

Finally, Ulrey's claim fails because Deputy Tatro's visual inspection of Jordan's vehicle was lawful under the plain view exception. When officers are in a place they have a right to be, even within a home, they may seize any evidence in plain view. *State v. Horn*, 278 Kan. 24, 36-37, 91 P.3d 517 (2004). Plain view is an exception to the search warrant requirement of the Fourth Amendment. *State v. Canaan*, 265 Kan. 835, 840, 843, 964 P.2d 681 (1998). Under this exception, "a law enforcement official can seize evidence of a crime if (1) the initial intrusion which afforded authorities the plain view is lawful; (2) the discovery of the evidence is inadvertent; and (3) the incriminating character of the article is

immediately apparent to searching authorities." 265 Kan. 835, Syl. ¶ 9.

Ulrey attempts to argue that Deputy Tatro had no right to return to Jordan's vehicle to retrieve her purse based upon "departmental policy." However, the argument ignores the fact that the vehicle was lawfully stopped by Deputy Tatro and, regardless of his subjective motives to retrieve the purse, the mere visual inspection of the vehicle, without opening any doors or windows, was not an unlawful act. Deputy Tatro was lawfully on Jordan's real property because Jordan chose to stop her vehicle in her driveway. The mere visual inspection of the items in plain view of the vehicle during the stop was not illegal. We need not reach the issue of whether the regulation requiring the seizure of the purse was lawful.

Certainly if " 'a motorist has "no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers," ' [Citation omitted]" *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008), a former passenger of the vehicle has no grounds to complain. See also *United States v. DeLuca*, 269 F.3d 1128, 1133 (10th Cir. 2001) (defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct directed toward that complaining defendant and that the contraband would never have been found but for the defendant's, and only the defendant's, unlawful detention).

Assuming he has standing to object, Ulrey contends that even with Deputy Tatro's detection of anhydrous ammonia coming from the car, there was no probable cause to arrest him or search Jordan's vehicle. Our Supreme Court has held that the strong odor of ether alone emanating from a vehicle, even without a legitimate explanation, does not constitute probable cause to search the vehicle. See *State v. Ibarra*, 282 Kan. 530, Syl. ¶ 3, 147 P.3d 842 (2006). "Although the smell of ether alone cannot establish probable cause, it may be considered with other evidence in the totality of circumstances for determining whether probable cause exists." *State v. Fisher*, 283 Kan. 272, Syl. ¶ 13, 154 P.3d 455 (2007).

However, Deputy Tatro had more than just the odor of anhydrous ammonia to justify his search. He also saw in plain view a jug with some kind of liquid, a crate containing rock salt, and coffee filters. Possession of a combination of items known for use in manufacturing methamphetamine can constitute probable cause to search a vehicle. See *State v. Schoonover*, 281 Kan. 453, 515, 133 P.3d 48 (2006) (The odor of anhydrous ammonia in an automobile may create probable cause to believe that anhydrous ammonia is not being stored in a legal container as required by law. Also, observation of coffee filters and Coleman fuel together with the odor of anhydrous ammonia is sufficient to establish probable cause.); *State v. Moore*, 39 Kan. App. 2d 568, 580, 181 P.3d 1258, *rev. denied* 286 Kan. 1184 (2008) (odor of anhydrous ammonia from vehicle, coupled with observation of a can of Coleman fuel, two cans of lighter fluid, and an open package of lithium batteries established probable cause to search the vehicle).

Based upon the record, it appears Ulrey lost standing to challenge the search of Jordan's vehicle when he was released from his detention by Deputy Tatro. Even if he still had standing to object, Deputy Tatro had developed probable cause of criminal activity based on evidence he smelled and viewed in plain view in Jordan's car. Thus, the search of the vehicle was lawful.

Ulrey also contends that admission of KBI scientist Chris Riddle's testimony about a report prepared by another KBI scientist violated his right to confrontation under the Sixth Amendment to the United States Constitution and was contrary to K.S.A. 22-3437. K.S.A. 22-3437(1) states: "In any hearing or trial, a report concerning forensic examinations and certificate of forensic examination executed pursuant to this section shall be admissible in evidence if the report and certificate are prepared and attested by a criminalist or other employee of the Kansas bureau of investigation, [or] Kansas highway patrol . . . ." Ulrey only objected to the report and testimony on hearsay and foundation grounds.

In its brief, the State only addresses the Confrontation Clause issue. The State simply asserts that Riddle's testimony was primarily about the process of manufacturing methamphetamine and that Ulrey was acquitted of the manufacturing and attempted manu-

facturing charges and other charges relevant to Riddle's testimony. Thus, the State argues, any error in admitting the evidence was harmless error.

No error implicating constitutional rights, including the right to confrontation, can be found to be harmless unless the court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. *State v. Hughes*, 286 Kan. 1010, 1015, 191 P.3d 268 (2008).

In this case, Ulrey was only convicted of possession of anhydrous ammonia and possession of drug paraphernalia, both with the intent to manufacture methamphetamine. The 1-gallon water jug smelling of anhydrous ammonia—which Deputy Tatro testified he recognized—was found on the floor of the back seat near where Ulrey had been sitting. Neither the charging document nor the instructions identified what "paraphernalia" Ulrey was alleged to possess. Even without Riddle's testimony, Deputy Tatro had testified he found a crate in the back passenger seat containing various items, including a box of Morton salt and an ice cream tub with coffee filters containing residue. The coffee filters, in the context of the other evidence, clearly support a finding of possession of paraphernalia. The intent factor—possession with the intent to manufacture—was supported by Riddle's testimony on the manufacturing process, to which Ulrey did not object, and probably could not have successfully objected to.

Since the jury acquitted Ulrey on the charges for which the evidence objected to was presented, the evidence obviously did not change the result of the trial to Ulrey's detriment. The charges he was convicted of were overwhelmingly supported by the properly admitted evidence.

Affirmed.