NOT DESIGNATED FOR PUBLICATION

No. 115,815

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RONALD E. HESKETT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Opinion filed March 23, 2018. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., SCHROEDER, J., and BURGESS, S.J.

PER CURIAM: During his trial, Ronald E. Heskett admitted on the stand that he purposely strangled Vance Moulton to death, although Heskett claimed he did so at Moulton's request in order to assist in his suicide. The State charged Heskett with first-degree premeditated murder, and a jury convicted him of the lesser charge of second-degree intentional murder. Heskett appeals, arguing that (1) the district court erred by failing to suppress evidence seized as a result of a search warrant; (2) the district court erred when it allowed the State to present evidence of Heskett's alleged prior bad acts pursuant to K.S.A. 2017 Supp. 60-455; (3) the district court erred in refusing to instruct

1

the jury on the lesser included offense of assisting suicide; (4) the district court violated Heskett's constitutional right to present his theory of defense when it limited defense counsel's closing argument; (5) the prosecutor committed reversible error during closing argument; and (6) Heskett was denied a fair trial based on cumulative error. For the reasons stated herein, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case were disputed at trial—except for one important fact. Both parties agreed that on September 12, 2014, Heskett purposely killed Moulton. The State's theory: Heskett murdered Moulton to cover up the fact that Heskett stole Moulton's money. The defense theory: Heskett ended Moulton's life at Moulton's suicidal insistence.

*Background and the events of September 12, 2014*

Moulton, who was 65 years old at the time of his death, suffered from cerebral palsy, resulting in a loss of mobility and requiring assistance in performing his everyday activities, such as bathing, changing his clothes, and feeding himself. He lived at the Prairie Ridge Place Apartments, located in Lawrence, Kansas. Moulton was a client of Trinity In-Home Care (Trinity). Trinity provides nonmedical support services for the elderly and the physically impaired. Heskett was a caretaker with Trinity. As a caretaker, Heskett's primary duty was to help his clients with their daily activities. Heskett began caring for Moulton in 2013.

On September 12, 2014, Heskett was scheduled to care for Moulton. According to Scott Criqui, Heskett's then-supervisor at Trinity, sometime between 9 and 10 a.m., Heskett informed Criqui at the Trinity office that Moulton previously had asked Heskett to kill him, but Criqui could not tell if Heskett was joking. Prior to Heskett's comment,

2

Criqui had never heard that Moulton was suicidal. Then, around 10 a.m., Heskett called Criqui to report that he found Moulton deceased in his apartment. In response to the phone call, Criqui had another employee call for emergency assistance.

Captain Patrick Talkington with the Lawrence/Douglas County Fire and Medical Department arrived at Moulton's residence at 10:03 a.m. Heskett was present at the residence when Talkington arrived. As Talkington entered the residence, he noticed Moulton lying in a hospital-type bed with a towel wrapped around his neck. After examining Moulton, Talkington pronounced him dead at 10:12 a.m.

At 10:16 a.m., Lawrence Police Department Officer Daniel Ashley was dispatched to Moulton's residence. After briefly speaking with Heskett at the residence, Ashley drove him to the police station for a more detailed conversation regarding Moulton's death. Heskett voluntarily agreed to speak to the police, and he was not a suspect at that time. Ashley asked Heskett before leaving for the police station if he had any property in the apartment, and Heskett said he had a "bag, like a work bag."

*The first interview and the search warrant*

Detective Sam Harvey and Detective Mike Verbanic, both with the Lawrence Police Department, interviewed Heskett on September 12, 2014. Heskett consented to the interview. During the interview, which was recorded and admitted at trial without objection, Heskett said he arrived at Moulton's residence at approximately 8:45 a.m. Heskett stated that he left the apartment to get quarters to do Moulton's laundry, and upon returning, he discovered that Moulton had committed suicide by strangling himself with a towel. Heskett then explained that Moulton had been suicidal for the prior six months.

While Heskett was being interviewed, Detective Randy Glidewell obtained a search warrant to search Moulton's residence. While Glidewell and other officers were

3

searching Moulton's residence, Harvey and Heskett returned to the apartment after the interview had ended. Harvey told Glidewell that a backpack in the residence belonged to Heskett and that Heskett was requesting it. Glidewell told Harvey that he needed to search the backpack before returning it to Heskett. During the search of the backpack, Glidewell discovered several items that appeared to belong to Moulton, including a bottle of hydrocodone prescribed to Moulton and two check stubs belonging to Moulton, one for $6,094.08 and the other for $7,099.10. Glidewell also found Heskett's wallet and Heskett's work-related material inside the backpack. At no time while searching Moulton's residence did any officer find a suicide note.

*The second interview*

On September 22, 2014, Harvey and Verbanic again interviewed Heskett with his consent. During the interview, the detectives pointed out to Heskett that Moulton did not appear to be strong enough to strangle himself to death. At that point, Heskett's story began to change. This time, Heskett stated that he tucked the towel tightly around Moulton's neck in order to help him commit suicide. Heskett further admitted that he never intended to do laundry and that the story was a ploy to deceive the detectives so he would not get in trouble. Shortly thereafter, the detectives left Heskett alone in the interview room, and he began to cut his wrists with a knife he had brought with him. Heskett told the detectives he cut himself because he felt guilty.

At this point, Harvey informed Heskett that he was not free to leave and read him the *Miranda* warnings. The detectives then asked Heskett about the check stubs found in his backpack. Heskett explained that he helped Moulton rent a safe deposit box and they put about $13,000 in cash from the checks into the box. Heskett indicated that Moulton was hoping to purchase a van. Finally, Heskett explained that his story changed because he initially wanted it to appear as though he was not present when Moulton died.

4

With Heskett's consent, police officers searched his truck and found receipts for vehicle parts and vehicle repairs totaling over $2,000. Also with Heskett's consent, police officers searched his residence and found more receipts showing automotive purchases.

*Proceedings in district court*

On October 31, 2014, the State charged Heskett with first-degree premeditated murder, in violation of K.S.A. 2014 Supp. 21-5402(a)(1). Both parties filed pretrial motions relevant to this appeal. Heskett filed a motion to suppress evidence obtained from the search of his backpack. In that motion, Heskett argued that the search of his backpack exceeded the scope of the warrant. The district court held a hearing and denied the motion to suppress. In a motion for reconsideration, Heskett also argued that the search warrant was "tantamount to a general warrant." The district court denied the motion to reconsider.

The State filed a pretrial motion requesting the admission of evidence related to prior crimes or civil wrongs under K.S.A. 60-455. The State wanted to admit financial evidence tending to prove that Heskett had been stealing money from Moulton. The State argued that the evidence was relevant to establish its motive for the crime, i.e., that Heskett killed Moulton because he discovered that Heskett had been stealing from him. After hearing arguments of counsel, the district court granted the State's motion, finding the financial evidence "[was] a prominent feature of the State's theory of its case."

The jury trial commenced on September 15, 2015, lasting seven days. In accordance with its theory that Heskett killed Moulton for financial reasons, the State presented evidence that between June 2013 and June 2014, Heskett's bank account was overdrawn on multiple occasions. The State also presented evidence that on June 2, 2014, Heskett's wife, Linda, deposited $500 cash into her bank account, and on June 10, 2014, Heskett deposited $2,000 cash into his bank account. The State then presented evidence

5

that in June 2014 Heskett spent a total of $2,673.88 on automotive expenditures. Also, in May 2014, Heskett bought a truck off Craigslist for $4,900 that he paid for in cash. The State then presented evidence that Heskett had substantial work done on the newly purchased truck, totaling $1,884.59, for which Heskett paid in cash. Regarding Moulton's finances, the State presented evidence that when officers searched his safe deposit box pursuant to a search warrant, the box was empty. Also, the day before he died, Moulton repeatedly called his bank. The day he died, Moulton's bank account was overdrawn.

In addition to the financial evidence, the State presented the testimony of Dr. Erik Mitchell, a forensic pathologist and coroner for Douglas County, who performed an autopsy on Moulton. Mitchell concluded that Moulton died as a result of being strangled, likely by the towel. Mitchell further concluded that Moulton's death was a homicide because Moulton could not have strangled himself to death with a towel. Finally, the State presented the testimony of numerous other witnesses who testified that Moulton was not suicidal, he was not depressed, and he was not on antidepressants.

Heskett testified in his defense. Heskett testified that he usually cared for Moulton six times a week, and he described the relationship between them as "very close," even caring for Moulton during his off time. Heskett said that Moulton generally was very happy, often joking with others, but things changed quickly in March 2014 when Moulton had surgery for kidney stones. Heskett testified that after the surgery, Moulton would frequently cry, and he became withdrawn from others. According to Heskett, Moulton was depressed, even going as far as asking Heskett to kill him.

Heskett also testified that even though Moulton was depressed, he still had an idea about fixing up an old car and selling it for a profit. Moulton wanted the extra money so he could get a new wheelchair-accessible van. Heskett claimed that Moulton gave him money to purchase the truck for the purpose of fixing it up and selling it for a profit, but

6

he did not keep track of the funds. Heskett testified that he did not tell anyone, including his supervisors at Trinity, about the money because he was afraid he would be fired.

Turning to the events of September 12, 2014, Heskett testified that he arrived at Moulton's residence early in the morning. According to Heskett, Moulton refused to get out of bed. Moulton asked Heskett to kill him, either by shooting him or smothering him with a pillow. Heskett told Moulton that if he wanted to die, he needed to do it himself. Heskett said he even gave Moulton a towel with which to strangle himself. While crying, Moulton attempted multiple times to wrap the towel around his head, but he was unsuccessful in doing so. Heskett testified that Moulton pleaded with him to end his life. By now, both men were crying. Heskett testified that he grabbed the towel and twisted it tightly around Moulton's neck. Heskett testified that he was trying to help Moulton commit suicide so he would not be in pain any longer. He further testified that he did not plan to help Moulton kill himself prior to the moment in which he did so.

During the instruction conference, the district court agreed to instruct the jury on the lesser included offense of second-degree intentional murder, but the district court denied Heskett's request for instructions on assisting suicide and voluntary manslaughter, finding the instructions were not supported by the evidence. Prior to closing arguments, the State made an oral motion in limine to restrict Heskett's closing argument. In particular, the State asked the district court to forbid Heskett from making arguments in regard to jury nullification and crimes not charged or instructed on, such as assisting suicide. Heskett did not object, and the district court granted the motion. After hearing closing arguments, the jury found Heskett guilty of second-degree intentional murder.

On November 20, 2015, the district court sentenced Heskett to the standard presumptive term of 195 months' imprisonment. Heskett timely filed a notice of appeal.

Heskett first claims the district court erred when it denied his motion to suppress the evidence seized as a result of the search warrant of Moulton's residence. Heskett makes two separate arguments. First, he argues that the search warrant for Moulton's residence was not sufficiently particular, amounting to a general warrant. Second, Heskett argues that the search of his backpack was outside the scope of the warrant.

The State argues that the search warrant was not overly broad and the officers did not exceed its scope by searching Heskett's backpack. Alternatively, the State argues that under the circumstances of the case, any error in the admission of evidence seized as a result of the search warrant was harmless.

The district court's decision on a motion to suppress is reviewed under a bifurcated standard. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. The ultimate legal conclusion of the district court's decision to suppress the evidence is reviewed using a de novo standard. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). When the material facts to a district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016).

*General search warrant*

Heskett initially argues that the search warrant for Moulton's residence was not sufficiently particular, amounting to a general search warrant. The Fourth Amendment of the United States Constitution and § 15 of the Kansas Constitution Bill of Rights require

that a warrant particularly describe the place to be searched and the persons or property to be seized. Likewise, K.S.A. 2017 Supp. 22-2502(a) requires that search warrants particularly describe the persons and places to be searched or seized. This particularity requirement prevents the search or seizure of something not described in the warrant and prevents the circumvention of probable cause. *State v. Francis*, 282 Kan. 120, 126, 145 P.3d 48 (2006).

"The constitutional standard for particularity of description in a search warrant is that the language be sufficiently definite to enable the searcher reasonably to ascertain and identify the things authorized to be seized." *Francis*, 282 Kan. at 126 (citing *Steele v. United States*, 267 U.S. 498, 503-04, 45 S. Ct. 414, 69 L. Ed. 757 [1925]). The test is case specific. *Francis*, 282 Kan. at 126. Further, the test is one of practical accuracy rather than one of technical sufficiency, and absolute precision is not required in identifying the property to be seized. See *State v. Rupnick*, 280 Kan. 720, 733-34, 125 P.3d 541 (2005).

Heskett argues that the search warrant of Moulton's residence amounted to a general search warrant because the warrant authorized the search and seizure of "[a]ny item or instrument believed to be linked to the cause or contributing factor of [Moulton's] death." The State disagrees and argues that the description was as specific as the circumstances surrounding Moulton's suspicious death allowed.

*Francis* is instructive on this issue. In that case, a jury convicted the defendant of first-degree murder for shooting and killing the victim. The search warrant at issue allowed the officers to search for "'[b]ullets, bullet fragments, weapons, shell casings, blood, bodily fluids, and other related trace and physical evidence related to a fatality shooting to [the] victim.'" 282 Kan. at 125. The defendant argued that because it was known that a gun was used to commit the crime, the search warrant should have used the term "firearms" instead of "weapons." 282 Kan. at 125. Our Supreme Court disagreed.

9

The court reasoned that because the term "weapons" appeared with the terms "bullets, bullet fragments, weapons, shell casings," the warrant effectively defined "weapons" as firearms. 282 Kan. at 126. The court concluded that from the context of the warrant, an officer could not reasonably make a mistake regarding what items the warrant permitted the officer to search or seize. 282 Kan. at 126. See also *Murray v. State*, No. 109,854, 2014 WL 3843092, at *11 (Kan. App. 2014) (unpublished opinion) ("'Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit.'"), *rev. denied* 302 Kan. 1011 (2015).

Here, combining the context of the search warrant with the circumstances surrounding Moulton's death, the warrant satisfied the particularity requirement. While the provision at issue did not explicitly list items to be searched or seized, the warrant contained limiting language preventing a reasonable officer from searching for any items not related to Moulton's death. The search warrant needed to be somewhat broad because the law enforcement officers had little information at the time the warrant was issued other than the fact that Moulton was found dead in his residence. Using common sense and considering the practical accuracy of the warrant, the description of items to be searched and seized was as specific as the circumstances allowed. Thus, we conclude that the search warrant of Moulton's residence was not so overly broad that it constituted a general warrant in violation of the United States and Kansas Constitutions.

*Scope of the search warrant*

Heskett also argues that the search of his backpack was outside the scope of the warrant. He points out that before his backpack was searched, Detective Harvey had told Detective Glidewell that the backpack in Moulton's residence belonged to Heskett and that he was requesting that the backpack be returned to him.

10

As a general rule, when executing a lawful search warrant of a residence, officers may search inside containers found in the residence if the object of the search reasonably could be found inside. See *State v. Schoonover*, 281 Kan. 453, 518, 133 P.3d 48 (2006) (citing *State v. Yardley*, 267 Kan. 37, 41, 978 P.2d 886 [1999]). But when an officer is on notice that a container, such as a backpack, belongs to a social guest of the residence, the officer usually may not search or seize that item without consent or a supplemental warrant. See *State v. Jackson*, 46 Kan. App. 2d 199, 207, 260 P.3d 1240 (2011).

In *Jackson*, this court adopted what is referred to as the notice test and held that when an officer has actual or constructive notice that an object located on the premises may not be subject to the warrant, the officer may not legally search that object pursuant to the warrant. 46 Kan. App. 2d at 202-03. However, under what is referred to as the "relationship exception," police are authorized to search the personal effects of a guest who is more than just a casual visitor and there is a relationship between the guest and the illegal activities described in the warrant. 46 Kan. App. 2d at 203.

Here, the State does not dispute that Glidewell was made aware that Heskett claimed the backpack belonged to him prior to searching it. However, the State argues that Glidewell could look inside the backpack because objects listed in the warrant could be found inside and because the relationship exception applied to the backpack search. The district court appears to have relied on the relationship exception in denying Heskett's motion to suppress the evidence seized from the backpack.

Heskett argues that the district court incorrectly applied the relationship exception. As Heskett was a care provider for Moulton, he was more than a casual visitor at the residence. Heskett appears to concede this prong of the relationship exception. However, Heskett was never connected to the illegal activities described in the warrant, i.e., Moulton's death, before the officers searched the backpack. To begin, the warrant does not mention Heskett. At the motion hearing, Harvey testified that Heskett was not a

11

suspect when he was interviewed on the day of the search. Glidewell testified that he searched the backpack only because it was part of the crime scene.

Based on the evidence at the hearing, the State failed to provide a nexus between Heskett and the suspicious circumstances surrounding Moulton's death prior to the search the backpack. Without that nexus, the State did not show that Heskett was connected to the illegal activity described in the warrant before the search of his backpack. Thus, we conclude the district court incorrectly applied the relationship exception and erred in denying Heskett's motion to suppress the evidence seized in the backpack.

The State argues that under the circumstances of this case, any error in the admission of evidence seized from the backpack was harmless. As this issue involves the warrant requirements guaranteed by the Fourth Amendment, the constitutional harmless error standard applies. Under that standard, this court must be convinced beyond a reasonable doubt the error did not affect the outcome of the trial based on the entire record. In other words, there must be no reasonable possibility that this error affected the guilty verdict. *State v. Kleypas*, 305 Kan. 224, 257, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

Here, the State introduced the evidence seized from the backpack to establish its motive that Heskett killed Moulton because he discovered that Heskett had been stealing from him. More specifically, the State introduced the evidence to prove the element of premeditation. However, the jury only convicted Heskett of second-degree murder. Thus, the jury rejected the State's attempt to prove premeditation, which is what the evidence seized from the backpack was intended to prove.

Heskett admitted at trial that he purposely strangled Moulton to death with a towel. From this testimony, in essence, Heskett admitted under oath to every element of second-degree intentional murder. Heskett's only defense at trial was that Moulton

12

wanted to die. Based on the strength of the State's evidence, we are convinced beyond a reasonable doubt that the jury would have convicted Heskett of second-degree intentional murder even if the evidence from the backpack had not been admitted at trial. Thus, we conclude that the district court's error in the admission of the evidence was harmless.

## K.S.A. 60-455 EVIDENCE

Next, Heskett claims the district court erred when it allowed the State to present evidence of his alleged prior bad acts pursuant to K.S.A. 2017 Supp. 60-455. The alleged improper evidence concerns financial records, i.e., check stubs, bank records, receipts for automotive expenditures, etc., that the State believed showed Heskett's motive to commit the crime. Heskett argues that this evidence was inadmissible under K.S.A. 2017 Supp. 60-455, especially without first requiring the State to prove that Heskett, in fact, had committed the alleged acts.

The State responds by asserting that the district court properly allowed evidence that Heskett stole from Moulton in order to establish motive for the crime. Alternatively, the State argues that any error in the admission of the evidence was harmless.

Resolution of this issue requires interpretation of K.S.A. 2017 Supp. 60-455, which provides in part:

> "(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.
> "(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

13

K.S.A. 2017 Supp. 60-455 guards against evidence of the defendant's prior crimes or civil wrongs from being admitted solely to show that the defendant had a propensity to commit the crime charged. However, this statute permits evidence to be admitted for the purpose of proving some other material fact, such as motive. Our Supreme Court has established a three-part test for the district court to use in determining whether evidence of a defendant's prior crimes or civil wrongs may be admitted under the statute and for an appellate court to apply when reviewing these matters on appeal:

> "First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.
>
> "Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.
>
> "Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion." *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012).

When evidence meets all these requirements, the district court must admit it with a limiting instruction. The limiting instruction tells the jury the limited purpose for which the evidence was admitted and that the evidence may only be considered for that limited purpose. *Torres*, 294 Kan. at 140. Finally, even if evidence is erroneously admitted under the statute, that error does not require reversal when it is harmless. 294 Kan. at 143.

Heskett complains that the district court improperly admitted evidence regarding two of Moulton's checks, which the State alleged Heskett stole, and the fact that officers

14

were unable to locate the cash from those checks. He further complains about the district court admitting evidence related to his and his wife's bank accounts, his purchase of a truck, his purchase of automotive parts, and his listing of a false purchase price for the truck. In essence, Heskett complains about the admission of any evidence that tended to prove he stole money from Moulton.

The State argues that any financial evidence was material because it established motive for the crime. The State's theory was that Heskett killed Moulton after he discovered Heskett was stealing from him. Evidence is material when the fact has some real bearing on the outcome of the case. *Torres*, 294 Kan. at 139. We agree with the State that the financial evidence of which Heskett complains was material to his possible motive to commit the crime. See K.S.A. 2017 Supp. 60-455(b) (such evidence is admissible when relevant to prove some other material fact including motive); *State v. Barber*, 302 Kan. 367, 374, 353 P.3d 1108 (2015) (recognizing that facts related to motive are material facts).

Next, the circumstances surrounding the financial evidence were disputed. Heskett testified that Moulton gave him the money to buy a truck, but the State asserted that Heskett stole the money from Moulton. Because the financial evidence had a tendency in reason to prove the disputed facts related to motive, the evidence introduced by the State at trial was relevant to prove the disputed material fact. See *State v. Reid*, 286 Kan. 494, 512, 186 P.3d 713 (2008) (finding that evidence establishing motive was probative).

Finally, the court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against Heskett. The appellate court reviews this determination for an abuse of discretion. As explained, the financial evidence was probative of motive. Simply because evidence harms Heskett's case does not make that evidence substantially prejudicial for the purpose of this test. See, e.g., *State v. Hughes*, 286 Kan. 1010, 1022, 191 P.3d 268 (2008) ("The State may nevertheless admit evidence

of motive to explain why the defendant may have committed the crime or crimes at issue even though motive is not an element of the offense.").

Heskett continues by arguing that the financial evidence was improperly admitted under K.S.A. 60-408, which provides in relevant part:

"When the . . . admissibility of evidence . . . is stated in this article to be subject to a condition, and the fulfillment of the condition is in issue, the issue is to be determined by the judge, and he or she shall indicate to the parties which one has the burden of producing evidence and the burden of proof on such issue as implied by the section under which the question arises."

Heskett contends that under this statute, the State should have been required to make a threshold showing that Heskett, in fact, committed the crime of stealing Moulton's money. Citing numerous cases from other jurisdictions, Heskett argues that the State failed to meet its burden that he actually committed the prior crimes.

Heskett's argument is misguided. K.S.A. 60-408 is not applicable to this case because the district court did not admit the financial evidence on a conditional basis. With respect to adopting a standard of proof, the guidelines for admitting evidence under K.S.A. 2017 Supp. 60-455 are clearly established:  The party must establish that the evidence is relevant to prove a disputed material fact and that the evidence is not unduly prejudicial to the defendant. Once the evidence is admitted, the weight to be given the evidence is a question for the jury to decide.

To sum up, the financial evidence introduced by the State under K.S.A. 2017 Supp. 60-455 was not admitted to show Heskett's propensity to commit crimes. Instead, the evidence was relevant to prove a disputed material fact, i.e., Heskett's motive to commit the crime. The probative value of the evidence was not outweighed by its potential for prejudice. Moreover, it is undisputed that the district court gave a limiting

16

instruction so the jury understood how to weigh the evidence. We conclude the district court did not err when it allowed the State to present financial evidence under K.S.A. 2015 Supp. 60-455 tending to prove that Heskett stole money from Moulton. Because we find no error, we will not address the State's claim that any error was harmless.

JURY INSTRUCTION ON ASSISTING SUICIDE

Next, Heskett claims the district court committed reversible error when it denied his request to instruct the jury on the lesser included offense of assisting suicide. Heskett argues that assisting suicide is a lesser degree of homicide. He briefly explains the history of criminalizing assisting suicide and details how other states have criminalized assisting suicide. Heskett argues that the district court was required to instruct the jury on his theory of the case and that the evidence in this case supported an instruction on assisting suicide as a lesser included offense of first-degree premeditated murder.

The State argues that the district court properly declined to provide the jury with an instruction on assisting suicide. The State argues that such an instruction was factually inappropriate because the evidence established that Moulton did not commit suicide.

For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are as follows:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert.*

17

*denied* 565 U.S. 1221 (2012).' [Citation omitted.]" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

At trial, Heskett requested the assisted suicide instruction. When the court rejected such an instruction, Heskett objected. Thus, Heskett has preserved this argument for appeal and step one is satisfied.

Heskett claims that assisting suicide is a lesser degree of homicide; thus, an instruction on assisting suicide as a lesser included offense of first-degree premeditated murder was legally appropriate under K.S.A. 2017 Supp. 21-5109(b)(1). The crime of assisting suicide is codified at K.S.A. 2017 Supp. 21-5407, which provides in part:

"(a) Assisting suicide is:

(1) Knowingly, by force or duress, causing another person to commit or attempt to commit suicide; or

(2) intentionally assisting another person to commit or to attempt to commit suicide by:

(A) Providing the physical means by which another person commits or attempts to commit suicide; or

(B) participating in a physical act by which another person commits or attempts to commit suicide."

As used in K.S.A. 2017 Supp. 21-5407, "'[s]uicide' means the act or instance of taking one's own life voluntarily and intentionally." K.S.A. 2017 Supp. 60-4402(b). In contrast, homicide is defined as one person killing another person. Black's Law Dictionary 851 (10th ed. 2014).

Under step two of the analysis, this court must determine whether an assisting suicide instruction was legally appropriate. To be legally appropriate, assisting suicide must be a lesser included offense of first-degree premeditated murder. *State v. Perez*, 306

18

Kan. 655, 667, 396 P.3d 78 (2017). Our Supreme Court has never addressed whether assisting suicide is a lesser included offense of premeditated murder, skipping this step and moving straight to determining whether the instruction was factually appropriate. See, e.g., *Perez*, 306 Kan. at 668; *State v. Baker*, 281 Kan. 997, 135 P.3d 1098 (2006); *State v. Cobb*, 229 Kan. 522, 625 P.2d 1133 (1981). We will do the same in this opinion.

Turning to the third step of the analysis, we must determine whether an instruction on assisting suicide was factually appropriate based on the evidence presented at trial. On this issue, we have significant Kansas caselaw to rely on, and all cases are similar to Heskett's case. In *Cobb*, the defendant injected the victim with cocaine in an attempt to help the victim commit suicide. However, the victim did not immediately die, and the victim appeared to the defendant to be suffering. To end the suffering, the defendant killed the victim by shooting him in the head. The *Cobb* court ultimately held that the evidence did not support the crime of assisting suicide and, thus, the defendant was not entitled to such an instruction. 229 Kan. at 525. The court found that there was no suicide because the defendant actually killed the victim; the victim "did not destroy himself." 229 Kan. at 526. The court concluded that when there is no suicide, there is no evidence to support giving an instruction on assisting suicide. 229 Kan. at 526.

Heskett attempts to distinguish his case from *Cobb* by pointing out that the assisting suicide statute has been amended since *Cobb* was decided. When *Cobb* was decided, assisting suicide meant "'intentionally advising, encouraging or assisting another in the taking of his own life.'" 229 Kan. at 525. Heskett emphasizes that the current statute defines the term as intentionally assisting another person to commit or to attempt to commit suicide by "participating in a physical act by which another person commits or attempts to commit suicide." K.S.A. 2017 Supp. 21-5407(a)(2)(B). Heskett argues there was evidence that he "participated in a physical act" to assist Moulton's suicide by holding a towel around his neck.

19

In *Perez*, our Supreme Court rejected the exact argument Heskett is now making on appeal. In that case, the defendant was convicted of first-degree premeditated murder, among other crimes. Because there was some evidence at trial that the victim was suicidal and the defendant may have caused her death by holding her under water until she drowned, the defendant requested a lesser included offense instruction on assisting suicide. The defendant in *Perez* argued that the amended statute on assisting suicide was broader than the statute in *Cobb* and included "'participating in a physical act'" by which another person commits suicide. 306 Kan. at 668-69. Our Supreme Court rejected this argument because the statute still requires a suicide, i.e., the taking of one's own life. 306 Kan. at 668. The court determined that the defendant was not entitled to an assisting suicide instruction because "the deceased did not perform the actual destruction, thus failing to satisfy one of the elements of the assisting suicide statute." 306 Kan. at 670. Our Supreme Court specifically found that the fact that the victim may have wanted to die will not support an instruction on assisting suicide when another person kills the deceased. 306 Kan. at 670.

Here, Heskett testified that Moulton attempted multiple times to wrap the towel around his neck, but he was unsuccessful in doing so. Heskett then grabbed the towel and twisted it tightly around Moulton's neck until he stopped breathing. An instruction on the crime of assisting suicide requires there to be a suicide, i.e., a person taking his or her own life. *Perez*, 306 Kan. at 668; *Cobb*, 229 Kan. at 526. Even considering the evidence in the light most favorable to Heskett, he did not "assist" Moulton in committing suicide; rather, he simply strangled Moulton to death after Moulton could not accomplish the task by himself. The fact that Moulton may have wanted to die, even if true, did not make Heskett's actions an assisted suicide. See *Perez*, 306 Kan. at 670. Heskett's act may be described from his viewpoint as a "mercy killing," but it did not constitute the crime of assisting suicide under K.S.A. 2017 Supp. 21-5407. Based on the evidence, a jury instruction on assisting suicide was not factually appropriate. Thus, the district court did not err in refusing to instruct the jury on the offense of assisting suicide.

Next, Heskett claims the district court violated his constitutional right to present his theory of defense when it limited defense counsel's closing argument. Specifically, Heskett contends that the district court should have permitted him to argue to the jury that he committed the crimes of assisting suicide or voluntary manslaughter. Because jury instructions were not given on these crimes, Heskett asserts on appeal that he should have been allowed to argue that the jury had to acquit him, even if it believed he may have committed some other crime. Heskett argues that his entire defense was based on him helping Moulton commit suicide, so it was unfair to prevent him from arguing that he committed the crime of assisting suicide.

The State argues that the district court properly prevented Heskett from arguing that he committed the uncharged crime of assisting suicide. The State adds that it is questionable whether the district court's ruling actually limited Heskett's ability to present his defense because the district court did not prohibit Heskett from mentioning suicide or emotions that could be related to heat of passion.

Using its sound discretion, a district court may limit the scope of closing arguments. With that in mind, a limitation on closing arguments is reviewed for an abuse of discretion. *Francis*, 282 Kan. at 143. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). However, when a district court limits a defendant's right to present his or her theory of defense, this limitation is reviewed de novo. *State v. Carter*, 284 Kan. 312, 318-19, 160 P.3d 457 (2007).

Heskett acknowledges that he is making this argument for the first time on appeal. When the State made its motion in limine to restrict Heskett's closing argument, he did

not object. This court generally will not entertain any arguments alleging errors regarding a motion in limine when no objection was lodged during trial. See *State v. Sprague*, 303 Kan. 418, 432-33, 362 P.3d 828 (2015). Heskett argues that we should make an exception because consideration of his claim is necessary to serve the ends of justice or to prevent the denial of his fundamental rights. Without deciding whether Heskett has properly preserved this issue for appeal—and while making it clear that we are not setting precedent for future cases—we will briefly address the merits of Heskett's claim.

It is a well-established rule that closing arguments must be based on facts in evidence. *State v. Crawford*, 300 Kan. 740, 748-49, 324 P.3d 311 (2014). As we discussed in the last section of this opinion, neither party presented evidence at trial that supported the crime of assisting suicide. Heskett admitted that he intentionally killed Moulton. He did not "assist" in Moulton's suicide because there was no suicide. An instruction on assisting suicide was not factually appropriate, so by permitting defense counsel to argue that Heskett committed the crime of assisting suicide, the district court would have been allowing counsel to argue facts not in evidence. Moreover, as the State points out, the district court only prohibited Heskett from arguing that he committed the uncharged crime of assisting suicide. The district court did not prohibit Heskett from mentioning suicide and, in fact, Heskett's closing argument included numerous references to suicide and Heskett's assertion that Moulton wanted to die.

The district court denied Heskett's request for a jury instruction on voluntary manslaughter, and Heskett does not challenge that ruling on appeal. In one sentence of his brief, Heskett asserts that the district court should have permitted him to argue voluntary manslaughter to the jury, but he provides no additional authority to support this assertion. Heskett's brief focuses on the fact that his entire defense was based on him helping Moulton commit suicide, so it was unfair for the district court to prevent him from arguing that he committed the crime of assisting suicide. A point raised incidentally in a brief and not argued therein is deemed abandoned. See *Sprague*, 303 Kan. at 425.

Generally, a limitation on a theory of defense involves the exclusion of evidence that is an integral part of the defense theory. See *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 (2009). Here, the district court never excluded any defense evidence and it never hindered Heskett's presentation of evidence in any way. Rather, the district court prohibited Heskett from arguing that he committed uncharged crimes because the evidence did not support any uncharged crimes. Thus, we conclude the district court did not violate Heskett's constitutional right to present his theory of defense when it limited defense counsel's closing argument.

PROSECUTORIAL ERROR

Next, Heskett asserts that the State committed prosecutorial error in closing argument. Heskett claims that the prosecutor "misstated facts and law, argued facts not in evidence, and improperly appealed to the passions and prejudices of the jury." Conversely, the State argues that the prosecutor did not commit reversible error during closing arguments.

A claim of prosecutorial error based on comments made during closing arguments will be reviewed on appeal even when a contemporaneous objection was not made at trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012). The appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To
> determine whether prosecutorial error has occurred, the appellate court must decide
> whether the prosecutorial acts complained of fall outside the wide latitude afforded
> prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that
> does not offend the defendant's constitutional right to a fair trial. If error is found, the
> appellate court must next determine whether the error prejudiced the defendant's due
> process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional
> constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18,

23

87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Heskett first takes issue with the State explaining the legal difference between suicide and murder. In particular, Heskett claims this passage from the State's closing argument was improper:

"Now, suicide is defined as self-destruction. It's the deliberate destruction of one's own life. If I take a gun and put it to my head and pull the trigger, then I've committed suicide. I have taken my own life.

. . . .

"It is not suicide, it is not self-destruction if a second person *participates* or does the overt act that kills another person.

"If I was to take that same gun and point it at another person and pull the trigger and kill that person, even if that person asked me to do that, even if they wanted to die, they have not committed suicide. They have been murdered, and they have been murdered by me." (Emphasis added.)

Heskett contends that this passage constituted a misstatement of the law. He correctly explains that "participating in a physical act by which another person commits or attempts to commit suicide" is included in the crime of assisting suicide. See K.S.A. 2017 Supp. 21-5407(a)(2)(B). Based on the language in the statute, Heskett argues that the prosecutor misled the jury regarding the legal difference between suicide and murder.

24

Reading this passage as a whole, the prosecutor did not step outside the acceptable parameters of closing argument. The gist of the prosecutor's statement was that a suicide involves a person taking his or her own life whereas a murder involves a person taking the life of another. As this entire case involved the difference between a suicide and a homicide, the prosecutor was permitted to explain that difference to the jury. In his closing argument, Heskett repeatedly stated that he was simply assisting Moulton to commit suicide when he strangled him to death. If Heskett could make these arguments, the prosecutor could clarify to the jury the difference between a suicide and a homicide.

Next, Heskett asserts that the prosecutor argued facts not in evidence when the prosecutor made statements to the effect that Moulton was not suicidal, that he was not on antidepressants, and that he had no history of mental illness. Heskett argues that the prosecutor needed expert testimony to support these statements. We disagree. The statements were a reasonable inference from the evidence presented at trial. Multiple witnesses testified that Moulton was not depressed or suicidal and that he did not have a history of mental illness.

Next, Heskett argues that the prosecutor improperly inflamed the passions of the jury with the following comments:

"Why didn't he decide to die while sitting in his chair, wearing his beloved Cardinals shirt? Look at how he died. He died in bed, wearing a soiled diaper. There is no dignity in that, is there?

"That is not dying on his own terms. Wouldn't he have come up with a better way to kill himself if he'd been thinking about this for six months to a year, as the defendant would want you to believe in account No. 5? Wouldn't he have wanted a painless way to die? Wouldn't he have wanted to overdose on Hydrocodone, just go to sleep?

"And if Vance and the defendant were so close—and you know they were—and Vance wanted the defendant to help him die, wouldn't Vance have wanted it to be done in a way that didn't implicate the defendant?"

25

Given Heskett's defense at trial, we disagree that the prosecutor's comments were improper. In context, the purpose of the comments was to show that Moulton did not commit suicide because if he had committed suicide, he would have done so differently. To reiterate, the whole case turned on the difference between suicide and murder. The prosecutor was trying to make the point that Moulton did not take his own life and he did not inflame the passions of the jury in doing so.

Finally, Heskett argues that the following statement made by the prosecutor constituted facts not in evidence, misstated the law, and improperly inflamed the jury:

> "Vance was smart. He had a sharp mind. Wouldn't he have come up with a way for the defendant to help him die without the defendant being implicated? *He could have left those Hydrocodone pills there, along with some water, and just walked out*. No. Vance would have had a plan." (Emphasis added.)

Again, considering Heskett's defense at trial, we disagree that the above comment was improper. The purpose of this comment was to show that Heskett actually killed Moulton. The prosecutor emphasized that Moulton was smart and he could have figured out a way to commit suicide had he wanted to do so. The comment did not misstate the facts or the law, and the comment did not improperly inflame the jury.

In sum, we find that the prosecutor's comments complained about by Heskett do not fall outside the wide latitude afforded prosecutors in arguing their cases. Thus, there was no prosecutorial error. Even if we had found any of the comments to be improper, we conclude the error did not prejudice Heskett to the extent that it denied him a fair trial.

CUMULATIVE ERROR

Finally, Heskett argues that he was denied a fair trial based on cumulative error. For cumulative error, the test is whether the totality of the circumstances establish that

26

the defendant was substantially prejudiced by all the trial errors and was denied a fair trial. In assessing the cumulative effect of trial errors, the appellate court examines the errors in the context of the entire record, considering how the district court dealt with the errors as they arose; the nature and number of errors and their relationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). Logically, a single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014).

We have identified only one error in Heskett's trial, i.e., the district court erred in admitting evidence of the items seized from Heskett's backpack because the search of the backpack was beyond the scope of the warrant. Under the facts of this case, we found that error to be harmless beyond a reasonable doubt. A single error cannot constitute cumulative error. Thus, Heskett was not denied a fair trial based on cumulative error.

Affirmed.